UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

PIONEER LABORATORIES, INC., d/b/a
PIONEER SURGICAL TECHNOLOGY

        Plaintiff,

v.                                          Case No. 2:05-CV-41

STRYKER CORP., and                       HON GORDON J. QUIST
HOWMEDICA OSTEONICS CORP.,

        Defendants.
_____/

## OPINION

Plaintiff Pioneer Laboratories, Inc. ("Pioneer") filed a complaint against Defendants Stryker Corp. and Howmedica Osteonics Corp. (collectively referred to as "Stryker") seeking a declaration that its surgical pedicle screw system does not infringe any of the claims of U.S. Patent No. 6,565,565 ("the '565 patent"), and that the '565 Patent is invalid under 35 U.S.C. §§ 102, 103, and 112. (Pl.'s Compl. ¶¶ 13 & 15.) Defendants moved for summary judgment on Plaintiff's claims, arguing that there is no genuine issue of material fact 1) that Plaintiff's product literally infringes the '565 patent, and 2) that the '565 patent is not invalid. For the following reasons, the Court will deny Defendants' motion for summary judgment that Plaintiff's product literally infringes the '565 patent, grant summary judgment in favor of Plaintiff that its product does not literally infringe the '565 patent, and dismiss Defendants' motion for summary judgment that the '565 patent is not invalid as moot.

## BACKGROUND

Pioneer, a Michigan corporation with its principal place of business in Marquette, Michigan, is engaged in the manufacture and sale of medical products. Stryker, a Michigan corporation with its principal place of business in Kalamazoo, Michigan, is also engaged in the manufacture and sale

of medical products.  Howmedica, a New Jersey corporation with its principal place of business in New Jersey, is the owner of the '565 patent.  Howmedica is a wholly-owned subsidiary of Stryker.

The technology at issue in this case relates to implantable spinal stabilization systems, specifically, pedicle screws, which are used in the surgical treatment of spinal disorders.  A pedicle screw is a particular type of bone screw designed for implantation into a vertebral pedicle.  Such screws are used to connect cylindrical spinal rods to the spine. (Defs.' Mem. Supp. Mot. Summ. J. Infringement at 2-3.) The '565 patent is directed to Stryker's implantable spinal stabilization system. Specifically, the patent is directed to a device for securing spinal rods of a spinal stabilization system.  ('565 Patent, at [54].)  The '565 patent was issued on May 20, 2003, and has three components: "a) a head portion having a channel extending therethrough configured to receive a spinal rod; b) a locking cap including a first [or upper] portion configured to engage an interior surface of the head portion, and a second [or lower] portion having an elongated recess configured to engage an exterior surface of a spinal rod received by the channel [extending through the head portion] . . . , the first [or upper] portion of the locking cap being mechanically joined and configured to rotate relative to the second portion of the locking cap; and c) a fastener portion depending from the head portion and configured to engage the spine."  ('565 Patent col. 12, ll. 6-20.)  (*See* '565 Patent figs. 14a and 11 below.)



From Fig. 14a of '565 Patent    From Fig. 11 of '565 Patent

The concededly novel component of the '565 patent (*id.* col. 8, l. 60), and the one which forms the dispute in this case, is the patent's two-part locking cap. The patent's specification describes the locking cap's upper portion as having a cylindrical body with a pair of arcuate (i.e. bowed) engagement flanges that extend outward from the cap body. (*Id.* col. 9, ll. 64-67.) Each engagement flange has a low side and a high side (*id.* col. 8, ll. 56-57) which enables it to operatively engage inclined arcuate engagement slots in the system's head portion. (*Id.* col. 6, ll. 45-67.) (*See* '565 Patent fig. 12B below.)



Pioneer introduced its Quantum pedicle screw in September 2004. Like the pedicle screw system disclosed in the '565 patent, the Quantum system has components common to essentially all

pedicle screw systems, such as a head, a fastener, and a locking cap. Like the locking cap disclosed in the '565 patent, Pioneer's system contains a two piece locking cap, an upper-portion (or cap) and a lower portion (or saddle). As in the '565 patent, the upper portion of Pioneer's locking cap contains two bowed tabs (or flanges) that fit into two slots in the system's head portion. Moreover, the cap is connected to the saddle so that the cap can rotate relative to the stationary saddle. Contrary to the '565 patent's specification, the tabs on the upper portion of Pioneer's locking cap and the slots in the head are not inclined. Moreover, the bottom of the upper cap and the top of the saddle "are contoured so that as the cap is rotated the bottom of the cap pushes against the saddle to separate the saddle from the cap and lock the rod in place." (Pl.'s Opp'n Defs.' Mot. Summ. J. Infringement at 8.) A spring clip, which connects the saddle to the cap, permits the saddle to separate from the cap as the contoured portion of the cap pushes down on the saddle. (*See id.* fig. 4 below.)



As the spinal rod is locked into place upon rotation of the cap, the tabs on the upper portion of the locking cap are pushed up into and mesh with the top inside surface of the slots in the head portion. (*See* Pl.'s Opp'n Defs.' M. Summ. J. Infringement at 9.)




## DISCUSSION

Defendants have moved for summary judgment that Plaintiff's pedicle screw literally infringes its '565 patent and that its patent is not invalid. Consideration of both these claims requires a court to first ascertain the scope of the patent holder's claimed invention. *See Athletic Alternatives, Inc., v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996) (noting that "[p]atent infringement analysis [requires] . . . the . . . construction of the meaning and scope of the asserted claim"); *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355 (Fed. Cir. 2000) (recognizing that "[t]he first step in any invalidity analysis is claim construction").

In this case, as is commonly seen in patent cases, there is a substantial dispute over the proper interpretation of the claims. Specifically, the dispute concerns the proper role of the specification in

interpreting the claims. The Federal Circuit elaborated upon the proper role the specification plays in claim interpretation in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). In the attempt to properly construe the claims here, the Court will first lay out the framework as articulated by the *Phillips* court. As a starting point, the Federal Circuit acknowledged that it "is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* at 1312 (citation omitted). In interpreting the claims, the "words of a claim 'are generally given their ordinary and customary meaning,' [which] . . . is the meaning that the [words] would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13. "Importantly," the court noted, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent . . . , and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful." *Id.* at 1314. However, the court continued, in many cases "the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, [and in those cases] the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (citation omitted). Those sources include not only "the words of the claims themselves," but also "the remainder of the specification." *Id.*

As the Federal Circuit had stated previously, and re-iterated in *Phillips*, "the specification is 'always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single

6

best guide to the meaning of disputed terms.'" *Id.* at 1315 (quoting *Vitronics Corp v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). *See Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) (noting that "[t]he descriptive part of the specification aids in ascertaining the scope and meaning of the claims inasumuch as the words of the claims must be based on the description. The specification is, thus, the primary basis for construing the claims."); *Bates v. Coe*, 98 U.S. 31, 38 (1878) ("in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid . . . in ascertaining the true intent and meaning of the language employed in the claims"). In summarizing the role the specification plays in interpreting claims, the court stated:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Id.* at 1316. "It is therefore entirely appropriate," the court acknowledged, "when conducting claim construction, [for a court] to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317.

After acknowledging the importance the specification plays in properly interpreting claims, the court then warned about "reading limitations from the specification into the claim." *Id.* at 1323. Although the court recognized that "the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice," it assured the courts with the duty to draw those distinctions that "the line . . . can be discerned with reasonable certainty . . . if . . . [a] court's focus remains on understanding

how a person of ordinary skill in the art would understand the claim terms."[1] *Id.* For instance, the court noted, "we have . . . rejected the contention that if a patent describes only a single embodiment, the claims of a patent must be construed as being limited to that embodiment . . . because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id.* "To avoid importing limitations from the specification into the claims," the court instructed, "it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention, and . . . [o]ne of the best ways to teach a person of ordinary skill in the art to make and use [an] invention is to provide an example of how to practice [it]. . . . Much of the time, upon reading the specification in that context," the court opined, "it will become clear whether the patentee is setting out specific examples to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be . . . coextensive."

With this language as our framework, the Court now turns to the disputed claim language. Claim 1 is representative of the independent claims that Stryker alleges Pioneer to have infringed. The relevant portion of the language of claim 1 is that which relates to Stryker's locking cap. It provides, "[w]hat is claimed is: 1. A device for securing a spinal rod to the spine comprising . . . b) a locking cap including a *first portion configured to engage an interior surface of the head portion* and a second portion having an elongated recess configured to engage an exterior surface of a spinal rod received by the channel . . . , the first portion of the locking cap being mechanically joined and configured to rotate relative to the second portion of the locking cap."

---

[1] The Court notes that how a person of ordinary skill in the art would understand a claim is, as the *Phillips* court stated, the basis upon which a court is to interpret claims. 415 F.3d at 1312-13 (recognizing that in interpreting claims, the "words of a claim 'are generally given their ordinary and customary meaning,' [which] . . . is the meaning that the [words] would have to a person of ordinary skill in the art in question."). Thus, it appears, to also ensure that a court does not read a limitation from the specification into a claim, but rather construes the claim in light of the specification, a court is to, similarly, "interpret the claims," i.e. "focus on how a person of ordinary skill in the art would understand the claim terms."

The language in dispute, as highlighted above, is "a first portion configured to engage an interior surface of the head portion." Specifically, the dispute concerns the proper interpretation of "configured to engage" as used in this context. Stryker offers no interpretation of the disputed claim language beyond asserting that the words should be given their "plain and ordinary meaning." Although the ordinary meaning of a claim term "is the meaning that the term would have to person of ordinary skill in the art," *Phillips*, 415 F.3d 1312-13, Stryker provides no interpretation as to how the disputed terms would be understood by someone skilled in the art. Rather, it simply concludes that every claim element in the '565 patent is present in Pioneer's pedicle screw system. With specific reference to the locking cap, it asserts that Pioneer's locking cap, like the one disclosed in the '565 patent, includes a first portion (with arcuate engagement flanges) configured to engage an interior surface of the head portion (i.e. arcuate engagement slots), and thus literally infringes the '565 patent.

Pioneer argues, in contrast, that, in light of the patent's specification, the claim language "a first portion configured to engage an interior surface of the head portion" must be construed to mean a first portion configured to cammingly engage an interior surface of the head portion. In support of this construction, Pioneer points out, as instructed by *Phillips*, that claims must be interpreted "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." 415 F.3d at 1313. Pioneer argues that "the '565 patent's specification discloses only one approach for providing the force to lock the [spinal] rod in place." (Pl.'s Opp'n Defs.' Mot. Summ. J. Infringement at 3.) "Every one of the '565 patent's disclosed locking caps, in every embodiment," Pioneer notes, "requires inclined arcuate engagement flanges that rotate in inclined arcuate engagement slots within the head portion to create [a] downward, camming force on the rod located in the head portion." (Pl.'s Supp. Mem. Re. *Phillips*

9

*v. AWH Corp.* at 6.) The following description of the engagement between the arcuate engagement flanges on the upper portion of the locking cap with the inside of the head portion is representative of the descriptions of this engagement throughout the specification:

> The flanged portion 64 of locking cap 20 is defined . . . by two diametrically opposed arcuate engagement flanges 82 and 84 which are dimensioned and configured for operative engagement with two complementary diametrically opposed arcuate engagement slots 86 and 88 defined in the interior surfaces of the opposed side walls 30 and 32 of head portion 22.
> [E]ngagement flanges 82 and 84 define ramped camming surfaces 92 and 94, respectively. Camming surfaces 92 and 94 are of opposite angular inclination with respect to one another. More particularly, each engagement flange has a low side . . . and a high side . . . whereby the low sides of the two flanges are diametrically opposed from one another as are the high sides. Actually, the camming surfaces of the flanges are mirror images of one another.
> [T]he arcuate engagement slots 86 and 88 in head portion 22 of fastener 14 have inclined surfaces which mate with the ramped camming surfaces 92 and 94 of flanges 82 and 84.

('565 Patent col. 6, l. 45 to col. 7, l. 1.) The patent's specification further provides:

> [C]are must be taken to ensure that the upper portion 220a of locking cap 220 is positioned in such a manner so that the low sides of the flanges . . . are aligned with the high sides of the engagement channels . . . , or the flanges will not cammingly engage the channels upon rotation of the upper portion 220a of the locking cap 220 relative to the head portion 222.
> Once the upper portion 220a of locking cap 220 has been properly oriented with respect to head portion 222 . . ., it is rotated . . . relative to the lower portion 220b of locking cap 220 . . . . Thereupon, the arcuate engagement flanges 284, 286 of upper portion 220 cammingly engage the corresponding engagement slots 284.

('565 Patent col. 11, ll. 15-30.) In light of this specification language, Pioneer concludes, the claim language "a first portion configured to engage an interior surface of the head portion" must be interpreted as requiring a first portion configured to cammingly engage an interior surface of the head portion (through the mating of inclined arcuate engagement flanges with inclined arcuate engagement slots), which produces the downward locking force needed to secure a spinal rod in place.

In interpreting claims, as instructed by *Phillips*, a court is to give the words of the claims their ordinary meaning as understood by a person of ordinary skill in the art. *Phillips*, 415 at 1312-13. The

10

*Phillips* court also noted that "[i]n some cases, the ordinary meaning of claim language . . . may be readily apparent . . . , and claim construction in such cases involves little more than the application of the widely accepted [i.e. general purpose dictionary] meaning of commonly understood words." *Id.* at 1313. Stryker appears to maintain that this is such a case. Although Stryker asserts that it is not proffering a dictionary definition of the phrase "configured to engage," (*see* Defs.' Resp. Re. *Phillips v. AWH Corp.* at 3), it must be advancing such an interpretation in maintaining this claim for literal infringement. This is so because the flanges on Pioneer's and Stryker's locking caps engage with the heads in their pedicle screw systems in different ways. Stryker's inclined flanges, as evidenced by the specification, cammingly engage inclined slots in the head portion, thus creating the force necessary to secure the rod, whereas Pioneer's flanges, which are not inclined, are merely pressed against the slots in the head portion of its system as the lower surface of Pioneer's upper cap cammingly engages the top surface of the saddle. For Stryker to successfully prosecute its infringement claim, then, it must be advancing an interpretation of "configured to engage" that is broader than "designed to cammingly engage." Its interpretation of "a locking cap including a first portion *configured to engage* an interior surface of the head portion" must be "a locking cap with a first portion 'designed to mesh or interlock' with engagement slots in the head portion" since, with such an interpretation, Pioneer's system would literally infringe the '565 patent, as its locking cap includes a first portion "designed to mesh or interlock" with engagement slots in a head portion.

Stryker's "dictionary definition," however, cannot serve as the definitive definition of the disputed claim language in this case. For one, this is not a case where the ordinary meaning of the disputed claim language as understood by a person of skill in the art is so readily apparent that the "claim construction involves little more than the application of the widely accepted meaning of" the disputed terms. It is true, of course, that the Court is not unacquainted with the words "configure"

11

or "engage," in the sense that a lay judge could recite their dictionary definitions. Detached from their context, however, these words can be defined only very generally. For instance, Webster defines "configure" as "1. to shape according to some model, and 2. to arrange in a certain form, figure, or shape: give a configuration to." Webster's Third New International Dictionary 476 (1971). Similarly, Oxford English Dictionary defines "configure" as "to fashion according to something else as a model, and . . . to put together in a certain form or figure." Oxford English Dictionary, available at http://www.oed.com. Webster defines "engage" as "to be or become in gear: interlock and interact," and by Oxford English Dictionary as "to interlock *with*, fit into a corresponding part." Webster's Third New International Dictionary 751 (1971); Oxford English Dictionary, available at http://www.oed.com. From the dictionary definition, then, the most one can say is that the phrase "a locking cap including a first portion configured to engage an interior surface of the head portion" means that the cap's first portion is shaped or arranged in a ceratin way to interlock or fit with the interior surface of the head portion. The way in which the locking cap is shaped or arranged to interlock or fit with the head portion, is, of course, indiscernible from the dictionary definition. Thus, in view of the fact that the ordinary meaning of the disputed terms is not readily apparent, the Court must look to the specification to properly construe the claims.[2]

---

[2] The Court notes that the phrase "configured to engage" is used twice in claim 1. ('565 Patent claim 1) ("a locking cap including a first portion *configured to engage* an interior surface of the head portion and a second portion having an elongated recess *configured to engage* an exterior surface of a spinal rod . . . .) The *Phillips* court noted that in construing a claim, "the context in which a term is used . . . can be highly instructive." 415 F.3d at 1314. For instance, the court explained, "[b]ecause terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* In *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356 (Fed. Cir. 1999), the court interpreted the term "discharge rate," which was used twice in the same claim, to mean the same thing in both usages, because identical language, which illuminated the phrase's meaning, was associated with the phrase in both usages. In this case, the phrase "configured to engage" is not used in the same way: the first usage relates to the engagement between the upper portion of the locking cap and an interior surface of the head portion while the second usage relates to the engagement between the lower portion of the locking cap and the spinal rod. There is no indication from the words of the claims that they should be interpreted to refer to the same form of engagement. Moreover, in light of the specification, a person of ordinary skill would not interpret the phrase to refer to the same type of engagement in both instances.

Not only must the Court look to the patent's specification because the ordinary meaning of the terms is not readily apparent, but also because, as instructed by *Phillips*, "the person of ordinary skill in the art is deemed to read the claim . . . in the context of the entire patent, including the specification." 415 F.3d at 1313. Reading the disputed claim language in the context of the specification, the Court concludes that the phrase "a locking cap including a first portion configured to engage an interior surface of the head portion" requires a locking cap with a first portion configured to cammingly engage an interior surface of the head portion. The '565 patent's specification envisions a number of different approaches and embodiments for teaching a person skilled in the art to make and use the invention. For instance, the specification explicitly recognizes that the disclosure is not limited to the particular fasteners shown in the embodiment, but rather envisions that any component designed for attachment to a spinal rod could be used. ('565 Patent col. 5, ll. 27-35.) Moreover, the specification also envisioned the following: both a one-piece and two-piece locking cap, (*id.* figs. 9 and 12(b)), a one-piece locking cap with transverse recesses on the bottom and one with a flat bottom surface, (*id.* col. 6, ll. 25-30), different tooling methods for rotation of the locking cap, (*id.* col. 6, ll. 37-40), and arcuate engagement flanges with and without radially inwardly directed tapers. *(Id.* col. 8, ll. 30-34.) The patent's specification, however, discloses one and only one approach for generating the force necessary to secure a spinal rod in place. That is, consistently throughout the specification, the embodiments contain a locking cap including an upper portion with inclined arcuate engagement flanges designed to cammingly engage inclined arcuate engagement slots in the head portion.

Stryker argues that an interpretation of the claim that requires a camming engagement between the first portion of a locking cap and the interior surface of a head portion would improperly "narrow

13

the scope of the asserted claims to the embodiment disclosed in the specification of the '565 patent." (Defs.' Resp. Re. *Phillips v. AWH Corp.* at 3.) To avoid improperly limiting a claim's scope to an embodiment in the specification, the Federal Circuit has instructed that courts should "focus . . . on . . . how a person of ordinary skill in the art would understand the claim terms." *Phillips*, 415 F.3d at 1323. The Court concludes that not only would a person of ordinary skill in the art consult the specification to aid in determining the meaning of the disputed terms, but such a person would also conclude that the claims require a locking cap with a first portion configured to cammingly engage an interior surface of a head portion, for "[t]here is nothing in the context [of the specification] to indicate that the patentee contemplated any alternative" for a locking cap other than the one disclosed. *Snow v. Lake Shore & Mich. S. Ry. Co.,* 121 U.S. 617, 629-30, 7 S.Ct. 1343, 1350-51 (1887). *See Phillips*, 415 F.3d at 1323 ("To avoid importing limitations from the specification into the claims," a court should read the specification with an eye towards "whether the patentee is setting out specific examples" to teach a person of ordinary skill in the art to make and use the invention, "or whether the patentee instead intends for the claims and the embodiments in the specification to be . . . coextensive."). Moreover, Stryker "is not entitled to a claim construction divorced from the context of the written description." *Nystrom v. Trex Co.*, — F.3d —, 2005 WL 2218632, at *7 (Fed. Cir. Sept. 14, 2005). In this case, the written description consistently describes a device where the camming force necessary to secure a rod into place is generated by the engagement of inclined arcuate engagement flanges with inclined arcuate engagement slots in the inside surface of a head portion.

Stryker also asserts that the phrase "a first portion configured to engage an interior surface of [a] head portion" cannot be interpreted as requiring a camming engagement because it did not disavow the full scope of the claim terms' ordinary and customary meanings. Requiring a disavowal

14

in the specification to construe a claim term more narrowly (or simply differently) than its dictionary definition "improperly restricts the role of the specification in claim construction." *Phillips*, 415 F.3d at 1320. As the *Phillips* court explained, "[a]ssigning such a limited role to the specification, and in particular requiring that any definition of claim language in the specification be express, is inconsistent with our rulings that the specification is 'the single best guide to the meaning of a disputed term.'" *Id.* at 1321 (citation omitted). Rather, a specification may not only expressly define a claim term, but it may also "define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Irdeto Access, Inc. v. Echostar Satellite Corp.,* 383 F.3d 1295, 1300 (Fed. Cir. 2004). In other words, "[w]hat *Phillips* now counsels is that in the absence of something in the written description . . . to provide . . . notice to the public . . . that the inventor intended a disputed term to cover more than the ordinary and customary meaning [as] *revealed by the context of the intrinsic record*, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary." *Nystrom*, — F.3d —, 2005 WL 2218632, at *7 (emphasis added). In this case, the Court will not read "configured to engage" in "a first portion configured to engage an interior surface of [a] head portion" to encompass the breadth of its dictionary definition where the phrase's meaning as revealed by the context of the intrinsic evidence demonstrates that the phrase must be interpreted as requiring a camming engagement between the first portion of the locking cap and the interior surface of the head portion.

Finally, the Court addresses Stryker's argument that *Phillips*, despite its extensive discussion of the importance of the specification in claim construction, supports its position that the disputed terms should not be read as requiring a "camming engagement." In *Phillips*, the dispute was over the meaning of the term "baffles." 415 F.3d at 1324. Both parties, stipulating to a dictionary definition,

15

agreed that "the term 'baffles' refers to objects that check, impede, or obstruct the flow of something." *Id*. The dispute concerned whether "baffles," as used in the claims, must be disposed at angles other than 90 degrees. Although the specification contained no disclosure of baffles disposed at right angles, but rather only at acute or obtuse angles, Stryker notes, the court concluded that the definition of baffles did not exclude baffles disposed at right angels. *Id*. at 1327. Similarly, Stryker asserts, the Court should not limit the disputed phrase "configured to engage" as requiring a camming engagement simply because that is the only embodiment disclosed in the specification.

The *Phillips* court reached its conclusion that baffles as used in the claim did not exclude those disposed at 90 degree angles not because it advanced a dictionary interpretation of the disputed term above that revealed in the patent's intrinsic evidence. Rather, it reached its conclusion upon reading the disputed language in the context of the entire patent. That is, applying the doctrine of claim differentiation, the court noted that since the dependent claims provided specific functions, such as baffles "disposed at angles for deflecting projectiles," to avoid rendering the independent claim redundant, it construed the independent claim as not requiring baffles disposed at acute or obtuse angles. *Id*. at 1324-25. In this case, however, the doctrine of claim differentiation is not applicable, as no other claims reference how "a first portion [is to be] configured to engage an interior surface of [a] head portion." Rather, in this case, the disputed claim language is ambiguous, and it is not made clear by reference to the remaining claims. Recognizing that "the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim," *id*. at 1316, this Court consulted the remainder of the specification. *Id.* at 1316. Upon review of the specification, the Court concludes that it demonstrates that a "locking cap including a first portion configured to engage an interior surface of

[a] head portion" requires a camming engagement between the first portion of the locking cap and the interior surface of the head portion.

In light of this claim construction, the Court must now determine "whether the accused product infringes the properly construed claim." *Athletic Alternatives*, 73 F.3d at 1578. "Where, as here, the parties do not dispute any relevant facts regarding the accused product but disagree over which of two possible meanings [of the disputed claim language] is the proper one, the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgement." *Id*. Since it is undisputed that Pioneer's product does not contain a locking cap with a first portion that is designed to cammingly engage an interior surface of the head portion, the Court concludes that no reasonable trier of fact could find that Pioneer's product literally infringes the '565 patent. Thus, the Court will deny Stryker's motion for summary judgment of infringement and grant summary judgment in favor of Pioneer that its product, in light of this Court's claim construction, does not literally infringe the '565 patent.

Finally, with respect to Stryker's motion for summary judgment that the '565 patent is not invalid, the Court will dismiss the motion as moot in light of its grant of summary judgment in favor of Pioneer that Pioneer's product does not literally infringe the '565 patent. In light of this conclusion, a decision on the motion for summary judgment that the '565 patent is not invalid is unnecessary, for even if the Court were to find that the patent is not invalid, that would have no impact upon the disposition of this action (i.e. Pioneer's product would still not literally infringe the '565 patent).

## CONCLUSION

For the foregoing reasons, the Court will deny Defendants' motion for summary judgment of literal infringement, grant summary judgment in favor of Pioneer that its product does not literally

infringe the '565 patent, and dismiss Defendants' motion for summary judgment that the '565 patent is not invalid as moot.

An Order consistent with this Opinion will be entered.


Dated:  October 13, 2005                               /s/ Gordon J. Quist
                                                    GORDON J. QUIST
                                              UNITED STATES DISTRICT JUDGE